Oh, yay. Oh, yay. Oh, yay. The Honorable Appellate Court, 5th District, State of Illinois is now in session. The Honorable Justice Cates presiding along with Justice Wharton and Justice Vaughn. The first case this morning is number 518-0578, People v. Crowe. Arguing for the appellant, David Crowe, is Jennifer Lassie. Arguing for the appellee, People of the State of Illinois, is Max Miller. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note, only the clerk is permitted to record these proceedings today. Okay, Ms. Lassie, are you prepared to proceed? Yes, Your Honor. You may go when ready. May it please the Court, I'm Jennifer Lassie on behalf of the appellant, Mr. David Crowe. The mistakes that occurred during v. Deere deprived Mr. Crowe of his right to a fair trial. The State indoctrinated the jury during v. Deere to believe that its independent witnesses were more credible and that Jones was incapable of testifying against Mr. Crowe. During v. Deere, the State told jurors that Jones was a scared, drug-addicted woman with low self-esteem and no family support, and because of that, she was a victim that was unlikely to cooperate with the prosecution. The State taught jurors that this case was like the violent Ray Rice case, and that like Rice's victim, Jones would not be able to testify against her attacker either due to fear or love. The State, using its dog-and-cake hypothetical, taught jurors to assume that it was Mr. Crowe who battered Jones, even if no one identified him as the man that attacked her. This was indoctrination pure and simple. The State asked jurors to prejudge the facts and the evidence. This was an improper preliminary final argument. In its response brief, the State claims that its questions during v. Deere were not fact-driven and that its questions were oriented towards the jurors' ability to be fair and objective. The State claims that it was ensuring that prospective jurors did not give an inappropriate amount of weight to independent witnesses. However, the record demonstrates that this claim is false. The State only relies on statements made during v. Deere to the jurors 1 through 4 to support its claims. However, the State's indoctrination was subtle at the beginning of v. Deere, where the State used questions that, with a passing glance, might have seemed innocuous. However, by the end of v. Deere, the State was heavy-handed and blatant in its indoctrination. By the time the State reached Juror 16, the State's intentions were obvious. Juror 16 initially said he would judge independent witnesses like any other witness. However, the State then explained to Jurors 16 and 17 that independent witnesses were more reliable and more credible than a victim because they had no stake and a victim had all the other reasons that they had talked about for not wanting to be truthful or to come forward. Both jurors confirmed that they would view the evidence in the light that the State explained that they should, and both made it onto the jury. Juror 23 initially said that she would weigh evidence and take all witnesses equally, not one over the other or anything like that. However, the State explained that independent witnesses had no stake and no reason to lie and that a victim who had to come into the courtroom and sit in front of the person that battered her did have reasons to lie. Juror 23 confirmed that she would find the independent witnesses more credible and more believable than a victim, and Juror 23 made it onto the jury. Mr. Crow was denied his right to a fair trial by the indoctrination that occurred during voir dire, and this error was compounded by the State's questioning of Officer Talbot and by the State's closing argument. During Talbot's testimony, the State had him explain to jurors what an independent witness was. During closing argument, the State reminded jurors of the questions that it had posed to them during voir dire, and the State explained to the jurors who all of the independent witnesses were in this case and why they were more credible. The State reminded jurors that they should fill in the blanks and assume that the dog ate the cake, meaning they should assume that it was Mr. Crow who struck the victim on April 13th. Had the indoctrination not occurred, jurors might have found that Mr. Crow was not the man that committed the battery that occurred on April 13th. This indoctrination issue was fully preserved, and this error was not harmless. Should this court find, as the State urges, that only a portion of the indoctrination issue was fully preserved, then that issue alone is sufficient for granting a new trial. However, this court could also find second-pronged plain error where the record shows that Mr. Crow was tried by a biased jury, and this court can find first-pronged plain error where the evidence was closely balanced, and the evidence in this case was closely balanced. The phone call from Mr. Crow to Officer Talbot was not overwhelming evidence. The call could have been prompted by Talbot driving to Mr. Crow's residence, and Talbot's testimony seems to establish that that is what prompted Mr. Crow's phone call to police. While Talbot initially claimed that Mr. Crow called and asked if Officer Talbot needed to speak with him about Jones, on cross-examination, Talbot admitted that Mr. Crow's call was most likely prompted by Officer Talbot driving to his home, and that Officer Talbot was the first to mention Jones, not Mr. Crow. When Jones testified, she said she was with Mr. Crow at some point on April 13th, but she never testified that he was the man that struck her on April 13th, and the state never asked her to. In fact, no one identified Mr. Crow as the man with Jones on April 13th. Excuse me, counsel. Didn't she indicate, though, that she was with Mr. Crow at the location where the alleged incident occurred at some point during the day? That's correct. Jones did testify that she was with Mr. Crow at some point during the day on April 13th, but that's as close as they got. I'm sorry, didn't she indicate that she was at the location or the intersection? She said that she was with him at some point during the day, and she did say that they were at the intersection. However, she also admitted that they with them living nearby the intersection, it makes sense that they would be in that area, and again, we're not arguing that there was insufficient evidence to convict. We're saying that the evidence was closely balanced. It was in no way overwhelming against Mr. Crow, and while the state cites reasonable doubt cases to argue that the evidence was not closely balanced here, that's not the standard. Whether there was sufficient evidence to convict is apart from the question of whether the evidence was closely balanced. Here, the evidence was not overwhelming. No one identified Mr. Crow as the man that struck Jones on April 13th, and the state never asked Jones to identify him as her attacker on April 13th. While Carriker, Hostow, and Miller established that Mr. Crow was with Jones three weeks before April 13th, this is not overwhelming evidence that he was the man that struck her on April 13th, and again, it was the April 13th incident that was in question at trial. Here, the indoctrination was blatant and egregious. Jurors were taught that Jones was unable to testify against Mr. Crow, and then the state refused to even ask her if Mr. Crow was the man who battered her. However, the state taught jurors during voir dire that she wouldn't have self-esteem and no family support. The state taught jurors that Jones was a victim that did not want to cooperate with the prosecution, and the state taught jurors that they would have to assume it was Mr. Crow, like they would have to assume it was the dog that ate the cake. This was a textbook case of improper indoctrination, and you can see as the voir dire progressed, it started out with the state being very gentle in its questioning. However, the state was blatant. By the time it got to jurors 15, 16, 17, and 23, all of which made it onto the jury, the state was very heavy-handed in its indoctrination, and if it didn't get the exact answer it wanted with the jurors' understanding that they would have to fill in the holes and find the independent witnesses more credible, the state led them directly to the train of thought that the state needed them to be at. Because of these errors, Mr. Crow was denied his right to a fair trial, and we would respectfully request that this court reverse his conviction and remand for a new trial, or alternatively, remand for a new sentencing hearing as requested in Argument 3. And unless your honors had any questions, I'll save the remaining for rebuttal. Ms. Lassie, you also raised as their principal a case. I think your briefing was done before People v. Burge. Yes, your honor, I was. It came out in between the response brief and the filing of the reply brief, so I was able to cite to it in the reply. Okay. Along those same lines that Justice Cates raised, in the case you were let's just say a collection of the their principles, but the jurors were able to raise their hands and indicated that they understood what was going on. I believe in this case, though, there was a procedure where the juror is not it. Is that correct? That's correct, your honor. Do you have anything you'd like to say about that at all? Yes, your honor. I think this case is distinct from Burge. I think Burge did establish that it was not error for a trial court to read all four of their principles at once. However, I still think this case is distinguishable because in Burge we had the prospective jurors affirmatively raising their hand to acknowledge their understanding and acceptance, and here we just have collective nodding, which is much harder to discern whether all of the prospective jurors are nodding in this time. I would argue it's distinct on the facts. Thank you. Justice Wharton, did you have the answer to your question? Thank you, Justice Cates. Okay. Justice Vaughn? No questions, thank you. Ms. Lassie, you'll have time for rebuttal as you did in your reply brief. Mr. Miller, are you ready to proceed? Yes, your honor. May it please the court, counsel, my name is Max Miller and I represent the people of the state of Illinois. On April 24, 2017, defendant was charged with both committing the offense of aggravated battery and domestic battery. The defendant's case proceeded to jury trial and he's found guilty on both counts. A defendant raises three issues on appeal, whether the presentation of their principles to the prospective jurors was erroneous, whether the jury was improperly indoctrinated, and whether the defendant was improperly sentenced. Regarding the recitation of their principles, the defendant admits the issue was not properly preserved and may only be reviewed under plain air. Our Supreme Court has held that issues regarding Rule 431B are reviewed under the first prong of the plain air analysis, that is, that both a clear and obvious error occurred and that the evidence was closely balanced such that the error affected the outcome of trial. The state maintains that no error occurred and that the evidence was not closely balanced. Rule 431B requires that the trial court during voir dire ask each potential juror individually or in a group whether the juror understands and accepts the following principles, that the defendant is presumed innocent of the charges against him, that before a defendant can be convicted, the state must prove him guilty beyond a reasonable doubt, that the defendant is not required to offer any evidence on his behalf, and that if the defendant does not testify, cannot be held against him. Mr. Miller, we've all read that rule. What do you say to Justice Wharton's question about nodding of the head? Do you think that's sufficient? Yes, Your Honor. So, looking at other Supreme Court cases such as Thompson, the rule really requires that the trial court ask potential jurors whether they understand and accept the enumerated principles, and the Supreme Court said that this mandates a specific question and answer process. Now, they've said in Wilmington that a failure to ask jurors if they understand the four principles is error in and of itself, but asking for disagreement and getting none is equivalent to juror acceptance of the principles. Now, in this case, during voir dire, the trial court did ask prospective jurors both whether they understood and accepted the principles. Our Supreme Court has highlighted the requirement of an opportunity for a response from each of the prospective jurors, but this was present here. The record shows that the trial court first questioned the jurors in the jury box, asked if they understood and accepted the principles, noted they were nodding their heads, and then questioned the remaining audience. The transcript then indicates that the trial court noted the nods of affirmations from the jurors present. Now, the defendant does argue there's a possibility the prospective jurors didn't hear the recitation because the trial court told them to use the microphone to keep their voices up or that perhaps because of some confusion during the state's questioning that they might not have heard it. But nothing by that contradicts a trial court's presumed competency in its ability to address a courtroom and judging whether or not they were able to observe adequate responses, which I think it's very clear from the transcript that certainly the trial court, upon its information and belief, believed that they all nodded in the affirmative and that it had satisfied the principles of XER. Therefore, the state does not believe that any error occurred. But if this believes that error did occur in that, the defendant still can't avail himself of plain error review because the evidence was not closely balanced. And just a quick review of the evidence in this case, a 911 dispatcher testified for the state on April 13th that she answered a call. A worker from a trash company reported a domestic disturbance where a male pushed a female with a black and white dress out of a white passenger car. We have Maureen Lane, a resident who notices an argument going on. She sees that the car stops. A male passenger exits the car. He's beaten on the window. He gets back into the vehicle. A woman who, as of yet unidentified, is pushed out of the vehicle. The man exits the vehicle again and proceeds to attack this woman who is screaming in her defense, trying to defend herself. And then Lane testifies that the guy gets in the car, drives off, and the woman begins walking away and she's following her. Now, Officer Douglas Talbot testified that he received a call from dispatch. He arrives on the scene and he sees a woman in a black and white dress walking down the street with a second woman close behind. They're identified as Jennifer Jones and Maureen Lane at the exact incident that this occurs. Talbot testified Jones has a blackened left eye. She's quiet. She's apprehensive. She's using short responses. He photographs the injuries. Those were submitted into evidence. And then when Talbot returns to the police station, he receives a phone call from the defendant asking if he needs to come in, if he's going to be arrested. He agrees to come to the police station to talk to him. He doesn't come. Jones did testify for the state, very limited testimony, but what she does provide is that she identifies the defendant in court, not at the time of the incident, and she said that she was in a physical dating relationship with the defendant at the time of the incident, and that she was in fact at the intersection of Aurora and Clay Street where she was found walking and where Lane lived. Less than three days later, we have a totally separate incident and totally different witnesses where we have Andrew Carriker testifying. He sees a male hitting a female in a car in a parking lot. There's yelling and screaming. Officer Jeremy arrives on the scene. He comes in a call about a battered female. He finds a man matching this description, identifies him as the defendant. The woman's identified as Jones by Hosto's partner, Sergeant Norton Miller. Jones appears to have two black eyes today. Those are photographed, submitted into evidence. So we have two different incidents, although only the one was charged, but different witnesses, different officers, but the exact same story. And this is unrebutted evidence, and so the state does not believe that this can be categorized as closely balanced, and therefore the defendant should not be able to avail themselves of plain air review. Next, the defendant raises the issue of improper indoctrination, and here the state maintains that all except one of these objections were not properly preserved and should be deemed waived. The trial court properly found that the state's questioning was not an abuse of discretion, which is the standard of review. If questions during voir dire create a reasonable assurance that any prejudice or bias would be discovered, a trial court does not abuse its discretion in allowing them. Prior to the jury instruction conference, trial counsel for the defendant noted a sidebar had been held off the record during voir dire, where an issue was raised regarding the state-specific questioning during voir dire regarding the weighing of evidence of an eyewitness, an independent eyewitness, as greater than that of a victim of domestic violence. Trial counsel noted an objection was made at that time for cause. Now, the state responded that the line of questioning was to determine bias, that they did not give any specific facts of the case, and that it was common practice to inquire about independent witnesses. The defendants arguing today that, you know, we have this progressive indoctrination that begins light but towards the end of it was heavier, but it's important to note that before the trial court determined any of this, voir dire was finished. This was, you know, done on the conference where they hashed this out. The trial court ruled that this was not indoctrination as it's common practice on part of the defense to ask similar questions regarding the testimony of a police officer. The trial court stated it never determined the questioning or examination to infer more weight should be given to the independent witness, only that they should consider that in light of all the evidence. Now, in a post-trial motion, the defendant stated the indoctrination. And on appeal, they argued that the objection preserved multiple claims of error, such as previewing the facts of the case, comparing the case to the violent Ray Rice video, encouraging the jury... Let's talk about that Ray Rice video a moment, although I don't think that was preserved by any objection specifically. Do you perceive the possibility of a jury being extraordinarily violent incident where the fiancee at that time of this football player was actually knocked out in an elevator and dragged? And the allusion to that in front of a jury, do you see any potential for prejudice there? No, your honor. First, I just wanted to maintain for the record that the state does not believe that this is properly preserved as you said, but no, I don't believe that that certainly is there because... So regarding the defendant, first off, has not cited any case law saying that showing a video such as this is inappropriate. So I can't refer to any specific authority on that. Now, the potential discovery of bias and prejudice is why the court should find that the video was permissible because the conversations about the video did in fact reveal bias and prejudice. For example, on the part of juror number three, they specifically discuss this in the short thing they say, I can think of the Ray Rice video with the young lady. Has anyone seen that? Are you familiar with that? And the juror answers yes. And he goes on to say, I guess love is blind, put it that way. I get to thinking my daughter went through this. And just looking at that exchange, he's revealed some potential bias, which allows not just the challenges, but also the defendant could look at that and say, oh, well, look, there's clearly some bias here. And I think that that would be important bias to root out before jury selection. May I briefly conclude? No, but thank you. Ms. Lassie? Well, before I let you, Justice Vaughn, do you have any questions of Mr. Miller? I guess back to that Ray Rice video, when he asks the juror, why do you think the victim in Ray Rice didn't want to testify? I mean, what is the relevance of what the victim in another nationally known case? If it's not indoctrination, why else would you ask that question? Your Honor, I believe that the point of the question was, again, simply to uncover bias and prejudice when you're dealing with cases such as domestic violence. Our Supreme Court in Reinhart sort of noted that in sexual assault cases, there has to be an analogous kind of extra effort to uncover bias regarding delayed reporting, credibility of a victim. And the state believes this is analogous to domestic violence, that there are so many preconceived notions about both victim and abuser that anything that is in the public realm of knowledge and that can be used to inform both counsel of potential jurors' opinions would be helpful. I understand that. It might be one thing to say, why do you think a victim would not come forward? But to ask, why do you think the victim in the Ray Rice case didn't come forward? And then extrapolate that over to the current case, it seems almost a step too far to me. What's your thought on that? I would just say perhaps that in order to ensure that the questioning was less fact-driven about that specific case, it may have been necessary to resort to sort of to get to the same issue with facts from, you know, a separate case, a case that is not at bar where the state does not have to offer any information that will come up over the course of trial that might prematurely influence them. Thank you. Thank you, Your Honor. Justice Wharton, did you have any follow-up? No, thank you. Okay, Mr. Miller, thank you very much for your comments. Ms. Lassie, rebuttal? Yes, Your Honors. With respect to the Ray Rice video, it's clear that this was a portion of the state's overall theme for its indoctrination. The state pointed to the Ray Rice video and used it to say, you clearly saw that this woman was battered here, and yet you also saw that she refused to press charges. And so you know that that's what happened in this case against Mr. Crow. And that was the state's theme. The state was not rooting out potential bias. The state would ask prospective jurors, can you understand reasons why a victim might not want to prosecute, you know, her partner? And the state would ask questions such as, would you hold it against us if a domestic violence victim refused to testify? And the jurors said no. And the state could have stopped at that point, but the state did not. The state went further and further. The state wasn't just ensuring that prospective jurors wouldn't hold it against them if the victim failed to testify and identify Mr. Crow. The state gave them reasons why that wasn't going to happen in this case. The state didn't just that the victim has a history of drug abuse. Can you understand how, well, in your family member who was abused had support, can you understand, well, in this case, that would affect why the victim wouldn't cooperate with the prosecution in this case. So the state repeatedly painted this picture of Jones as a woman struggling with a drug addiction alone in the world without family support, unlike this prospective juror's family member. The state pressed the jurors, telling them, can you understand why an independent witness has no stake in the case and is more reliable and more credible? Can you understand why a victim has reasons to lie? Why it's hard for her to come in here and sit in front of the person that battered her? So the state wasn't just rooting out potential bias or prejudice. The state went much further. And the questioning here was entirely unnecessary and entirely improper. It was indoctrination, pure and simple. The state was setting up for its closing argument. And by the time the state got to its closing argument, it reminded the jurors of everything it had taught them during voir dire. This was entirely improper. It was textbook indoctrination. With respect to the evidence being closely balanced, the state went on at length about the evidence in this case. It's clear that Jennifer Jones was the woman at the scene. And it's clear that Jennifer Jones was battered by someone. What was not clear at trial was whether Mr. Crow was the attacker on April 13. That evidence was not overwhelming. It simply wasn't. The state did not have strong evidence that he was the man on April 13. And again, he was on trial for the April 13 incident and not the April 16 incident that occurred three days later. So the state really focused on who all saw Jones being battered. That Jones had black eyes. I think there's strong evidence she was battered. It's not clear that it was Mr. Crow who attacked her on April 13. That evidence was not overwhelming. With respect to the Rule 431 error, the state at one point during its oral argument, and I believe it also did so in its response brief, the state claims that the court noted for the record that all the jurors nodded. This is incorrect. That did not happen. The court on page 74 of the transcript asked if jurors understood and accepted those four principles. And the court looked to the jury box and confirmed everyone is nodding their head there. How about in the audience? Do you understand and accept those principles? The court did not note that all the jurors in the audience were nodding their heads and accepting and indicating their understanding and acceptance of the Zaire principles. The court did not note that for the record. And jurors were nodding affirmatively. That's what the court reporter wrote. It was not the judge. So the record does not reflect that the judge observed everyone who made it onto the jury nodding. And I think when we just consider a group of people nodding, you know, some people nod as they listen. Were these jurors nodding as they listened to his questions? Were they nodding to see that every single person is nodding? I think when we look at this record, did he get a fair and impartial jury that understood and accepted all these principles? Your time is expired. I have to cut you off there. I apologize. But your time is expired. I did the same for Mr. Miller. So thank you for your comments. Justice Wharton, do you have any questions? No questions. Thank you. Justice Vaughn? No questions. Thank you. Okay. All right. This matter of people versus David Crowe will be taken under advisement and will issue an order in due course. I'm sorry I couldn't give you more time, both of you, but thank you for your arguments. Thank you, Your Honor. Okay, that will conclude this matter for today.